Edward H. East, Special Judge,
delivered the opinion of the Court.
This case comes from the Chancery Court of Montgomery County.
The original hill was filed by the Planters’ Bank of Tennessee and D. Weaver, Trustee, against J. G. Horn- *533 berger and William P. Hume, and alleges, in substance, tbat prior to the 15th day of February, 1862, the Planters’ Bank had a branch located in the town of Clarks-ville, with a President, Cashier and Directory, who were charged with the business and interests of the bank at that point; that said bank also had at that point, attorneys, whose business was to advise upon all legal questions, prosecute and defend suits in behalf of the bank; that in the course of its business, large sums of money became due the Branch Bank at that point; that there had accumulated an indebtedness to the bank of several hundred thousand dollars, evidenced by bills, notes, etc.; and for a large part of said indebtedness, and to secure the same, the bank had taken and held collateral securities.
That after the 15th of February, 1862, said branch office was discontinued, and no further appointment was made of officers, although Hume, the former Cashier, continued to act as the agent of the bank. That upon the reorganization of the State government in 1865, and the opening of the courts, it was determined to initiate such legal proceedings as were necessary to close up and settle the affairs of said bank, with all its debtors. That for many years previous to 1862, the law-firm of House & Hornberger, composed of John F. House and J. G. Hornberger, had been the attorneys of the bank at that point; that House had left Clarksville in the year 1862, Hornberger alone had been employed during the year 1861, to file bills, attaching the property of a few of the non-resident debtors of the bank. That in March *534 or April, 1865, negotiations were opened by the principal bank at Nashville, through D. Weaver, Cashier, with Mr. Hornherger and other gentlemen of the bar at Clarksville, with a view to ascertain what terms the bank could have the collections made for, and in case of the insolvency of any of the parties, upon what terms the claims could be reduced to judgments; that various propositions were made, of which one or more from said Hornherger were submitted, and finally, on the 10th of April, 1865, Hornherger addressed a letter to Hume, (through whom the correspondence was mainly conducted,) intended to be submitted to Weaver, which letter stated, in substance, that the bar at Clarksville had adopted a schedule, or table of fees, by which the lawyers would thereafter be governed; and that, at the time of the adoption of this schedule, the privilege was given to Hornherger alone, to make terms with the bank for its business, at a lower or different rate from that set down in the schedule. The bill further charges, that Hornherger had assembled the principal members of the bar, and, after consultation with them, agreed to modify a previous proposition that he had submitted; the substance of which modified proposition was as follows :
“Eor all unlitigated cases at law, four per cent. Eor all litigated cases at law, eight per cent. Eor all un-litigated cases in equity, four per cent. Eor all litigated cases in equity, eight per cent. Eor all unliti-gated appeals to the Supreme Court, two per cent. Eor all litigated appeals to the Supreme Court, four per cent.”
*535 The bill charges further, that said proposition was a part of a letter; and that said letter contained, also, the following:
“However, such paper as the bank may regard as insolvent, I am, if not litigated, willing to reduce to judgment for one per cent., or for nothing. My opinion, from the slight, examination I gave the claims of the bank, soon after my return from Nashville, is, that there are very few, if any, that may be regarded as insolvent, though some of them will require vigilance and attention. The very fact you and the bank are so anxious for me to have' the business, (the whole of it, as you say,) and the fact that no other attorney is privileged to deflect from the schedule, inclines me to put my fees even lower than they should be.” Said bill further charges that, under the circumstances described in said letter, the bank, through its Cashier, (Weaver,) accepted Hornberger’s proposition, and all the bills, and notes, or other evidences of debt belonging to the bank at Clarksville, which were not already in his hands, were given over to him, whose judgment •and discretion were entirely trusted in the matter of suits, etc. That complainant and its officers were at Nashville, and knew but little about the condition of the debtors; and had most implicit confidence in defendant, who had so long been, and was then, its attorney ; and no distinction was made in the papers turned over, determining what was, or was not, solvent.
Said bill further alleges, that in the month of July, 1865, the bank executed to Weaver, as Trustee, a gen *536 eral assignment of all its property for the benefit of its creditors; and that Hornberger, who had, in the meantime, brought suits upon nearly all the paper placed in his hands, and had collected and remitted a part of the money collected, refused to pay over to Weaver any other sums in his hands, claiming a lien, as an attorney, upon the same; and, also, a general lien upon all the notes for all fees due him, or thereafter come to be due him for all collections made, or to be made, under the contract. That Weaver admitted his right to retain commissions upon the sums collected in the particular cases, but denied his right to retain for other cases, and particularly when the services were not rendered; also, the defendant claimed the right to hold all moneys then in his hands, or that would come into his hands, to indemnify himself as the surety of the bank for all liabilities he had assumed, as security upon a number of prosecutions and attachment bonds, which he had executed in bringing the suits. Said bill further charges, that a correspondence between the parties here sprung up, which indicated a great difference in its practical results, in the construction each gave the contract.
That the notes passed to the defendant for collection in 1864, amounted to about one hundred thousand dollars; that on these he had brought suit in 1864 against some of ■ the parties, and had again in 1865 brought other .suits against the same or other parties, upon the same claims, and that he now claims the right to charge commissions, in each and every case, as if the demands *537 were different and distinct, when collaterals were in his hands. He also claimed the right to charge commissions, not only upon the principal debts, but also upon the collaterals; that commissions made out upon this basis, in many cases, would amount to one-half or two-thirds of the whole debt, while the parties were wholly insolvent, and with no property subject to execution. That said correspondence showed a further difference, to-wit: That Hornberger claimed, and still claims, to have all fees paid in advance. That the bank, or its officers, do not know what sums have been collected, nor from whom these collections were made. That Hornberger had been paid some §5,000 before the differences grew up, and that one of Hornberger’s letters, dated March 19th, 1866, shows that he had collected up to that date, §57,438.05, nearly all of which were in the notes of the bank. That Hornberger claims as due him for moneys collected in 1864-’65-’66 about §55,000, and also claims that he should be paid in national currency. That there will not be collected, of the whole amount turned over to him, more than §150,000, and the greater part of this will have to be eventually collected by bills in chancery, filed to set aside conveyances made by parties who are, or will be, sued at law. That the Smiths owe the bank an aggregate debt of about §275,000, evidenced by various notes and bills of their different firms. That actions at law have been brought upon these, or some of them; also, suits in equity, and the same will be litigated in both courts. That when judgments are obtained, if ever, bills will have to be filed to *538 set aside conveyances, which will be contested, and that if part only is finally collected, it is feared that, if defendant was allowed fees upon the construction of the contract as claimed, it would consume the entire amount, as the double commissions upon each litigation would swell his fees beyond any conception the bank or its officers had at the time the same was entered into, and was not in accordance with a ’ fair construction of the contract.
That the bank has always been willing to pay a reasonable compensation for his services, and, actuated by this feeling, did heretofore pay him for his services in 1864 more than $5,000; and finally, a short time before the bill was filed, tendered him $15,000 more, in full of all services rendered under the contract, and agreed further, to release him of all liability on bonds as surety in its behalf, and free him of all charges and responsibility and labor as the attorney of the bank. That the defendant refusing to accept, thereupon he was notified to act no longer as the attorney of the bank, and to turn over to the agent of the bank all the notes, etc., in his hands, as well as moneys. That defendant refused to yield his position as attorney, or otherwise comply with the demands of the notice, but that he still holds the papers, and acts as the attorney of the bank, in all cases in court, and collects money as such.
The bill prays a discovery from Hornberger, of all moneys he has collected, of whom, and when, and its kind, and where it is kept, and that he be ordered to deliver it up, together with all evidences of debt, etc., *539 and that he he paid for all services rendered to the day he was notified to cease acting as the attorney of the bank, and for all other and further and proper relief.
The schedule of fees, which is made an exhibit to the bill, is as follows:
“ General retainer, not less than $50. Counsel and advice, in every instance, not less than $5. Two per cent, on the first $1,000, one per cent, on the next $4,-000, and one-half per cent, on the next $5,000, and one-fourth per cent, on all additional sums; provided, the fee shall not exceed $500. Counsel and advice one year, not less than $25; but this is not to include counsel and advice to executors, trustees, agents, guardians, etc., as each of these are separate charges.
“ Written Opinions. — Not less than $25; three per cent, on the first $1,000, two per cent, on the next $4,-000, one per cent, on the next $5,000, and one-half per cent, on all additional sums; provided, the fee shall not exceed $1,000.
“Eor writing mortgages and deeds of trust, not less than $25; for writing and advice, three per cent, on the first $1,000, two per cent, on the next $4,000, and one per cent, on the next $5,000, and one-half per cent, on all additional sums; provided, the fee shall not exceed $1,000.
‘■‘■Depositions. — Not less than $10 for each deposition; for each day employed in taking depositions, $50. If the attorney is regularly employed in the case, not less than $5 for each deposition, and for a day’s services in *540 taking depositions, $25 per day, all costs and expenses to be paid by the client.
“Collection Suits. — When plaintiff and defendant reside in Montgomery County, not less than five per cent, for collections, whether suit is brought or not; and in all other cases not less than ten per cent., whether suit is brought or not, except when the sum exceeds $5,000, and then such rates as may he agreed on; but not less than three per cent., where the parties reside in the county, and seven per cent, in all other cases. When the defense is for delay, not less than $10, in any case; two per cent on the first $1,000; one per cent, on the next $4,000; and one-half per cent on the next $5,000; and one-fourth per cent, on all additional sums; provided, the fee shall not exceed $500. When the debt or claim is litigated, the fee will be governed by litigated cases.
uJustices of the Peace. — Special retainer, not less than $10; actions of forcible entry and detainer, not less than $20, (with various charges, not necessary to mention.)
“ Chancery Court. — Special retainer, not less than $30; divorce cases, not less than $50; filing bill, not less than $30; filing answer, not less than $30; attachment bills for the collection of money, when not litigated, the same rates as the collection of claims, with the addition of $30 for filing the bill; filing injunction bills, not less than $30; then three per cent, on the first $1,000; two per cent, on the next $4,000; *541 one per cent on the next $5,000; one-half per cent, on all additional sums.
“ Filing attachment and injunction bills, not less than $30; then seven per cent, on the first $1,000; six per cent, on the next $4,000; five per cent, on the next $5,000, and four per cent on all additional sums. If the case is truly and severely litigated, not less than fifty per cent, will be added, to be governed by the above scale.
“Eor filing bills to foreclose mortgages and deeds of trust, not less, in each case, than $30; then six per cent, on the first $1,000; five per cent, on the next $4,000; four per cent, on the next $5,000; and three per cent, on all additional sums. If the case is truly litigated, or attended with unusual trouble, not less than fifty per cent, will be added, to be governed by the above scale.
“Eor receiving and receipting for money, in addition to the regular attorney fees, one-half the collection rates will be charged; in all other cases the collection rates.
“Supreme Court — Special retainer, not less than $30. All other fees will be governed by the Circuit, Chancery and Criminal Courts. The attorney, however, has the discretion of increasing or decreasing those rates in the Supreme Court.
“ Cirouit Court — Special' retainer, not less than $20, except in mere delay suits.
“In cases where the Circuit and Chancery Courts have concurrent jurisdiction, the fees will be governed by *542 the Chancery Court as security for costs, not less than $15. As security on attachment bonds, the same as in Chancery Court. In litigated suits, not less than two per cent, on the amount in litigation.
‘•‘•Attorney and Client — No attorney shall become the security of any home-client, except in a special case. In case the same attorney is retained, generally, by two persons whose interest conflict, the party first retaining him is entitled to the services of such attorney.
“All fees are due from the time of employment, and bear interest from that time. This schedule embraces the very lowest fees in any case, to be paid in current funds.
“All fees, except those specially mentioned, will be at the discretion of the attorney, or will be such as may be agreed upon.
“All fees must be paid at the time of employment, unless the attorney consents for the client to secure the same, and then fifty per cent, will be added; and if not paid or secured, one hundred per cent, will be added; the object being to abolish the credit system. No attorney will henceforth regard himself as the standing attorney for any one who does not come forward and pay or secure the general retaining fee.
“No attorney, after giving notice to his client, will proceed with any suit or unsettled business in his charge, until the fee or fees due him thereon are paid or secured, as in the manner stated; nor will he regard himself employed in any case where the special retaining fee has not been paid.
“Adopted at Clarksville, Tennessee, June 11th, 1864.”
*543 In the foregoing we have extracted only so much of said schedule as could have reference to a case like the one before the Court.
The defendant, Hornberger, filed an answer and cross-bill. This answer and cross-bill admit that the law-firm of Hornberger & House had been for several years the attorneys of the branch bank, and that House was a director in the same; and aside from meeting the board, respondent had more to do with the attorney-ship than House. That in 1861 House left the State, and the attorneyship of the bank continued in charge of respondent. That on the fall of Eort Donelson, in 1862, all the courts were closed, and the bank was principally conducted by Weaver, but that the local cashier (Hume) would, from time to time, apply for advice to respondent, upon such matters as he was not specially directed in by the officers of the mother bank at Nashville. No charge, however, was made for these services. In March, 1864, in obedience to instructions, Hume requested respondent to bring attachment bills against some of the debtors of the bank: and such bills were filed, and covered about $100,000 of indebtedness.
Respondent further states, that in the summer of 1864, Hume expressed the opinion that the bank would wind up, and that, in order to collect the assets, they would have to be placed in the hands of an attorney, and desired to know what would be the charges and fees of respondent if the business was passed to him; stating, at the same time, he intended to send the proposals to Nashville. A letter was addressed to Hume, *544 but intended for the bank at Nashville. In this letter, respondent advised against making the intended action of the bank public, but thought the interest of the bank would be promoted by granting renewals, taking deeds of trust and mortgages, etc., and presents many reasons to sustain these views; but stated, that if the bank should determine to wind up, that as soon as the courts opened, the claims should be put into judgments, so as to get first liens, and states that the change in the currency, as well as the condition of the country, made it difficult to determine what would be proper fees; that respondent was willing to be governed by the same fees as the bank attorney at Nashville.
Respondent further states that Weaver replied, through Hume, that the bank had no arrangement with the Nashville attorney. Respondent then states the action of the bar at Clarksville, in reference to the schedule adopted the 10th of June, 1864. On the 19th of June, 1864, respondent addressed a letter to Hume in reference to the unpaid fees of Hornberger & House, and in that letter inclosed the schedule of fees. In this letter are contained the following:
“We have, heretofore, charged the bank only two- and-a-half per cent, for obtaining judgments or collecting in unlitigated cases, but this charge, at the time, was equal to gold. Now, two-and-a-half per cent, in greenbacks, or Planters’ Bank money, is, in fact, less than one per cent. However, we are willing' to abide by the rules and arrangements that the bank may have made with Mr. Eogg, the Nashville attorney. You *545 will, also, see from the schedule that all fees are cash in advance; hut upon this point we will abide the wishes of the bank, as it has ever paid over fees when called for. We would, however, prefer adhering to the schedule in all cases, if possible, as this is the determination of the bar here.”
The answer charges that this letter, with the accounts of unsettled fees and schedule, were sent to Nashville, and the bank at Nashville ordered Mr. Hume to pay the account, and censured him for not paying it before; and instructed him in future to pay all fees in advance; that is, at the time the claim was handed out for collection.
Respondent alleges that Hume saw him several times in 1864 and 1865, and desired to know what his fees would be, if the claims were placed in his hands; and urged him to come to some terms, stating that the claims would amount to about $400,000, besides, interest, and that the fees were cash; and gave this latter as a reason why respondent should be liberal. About the 1st of March, 1865, Hunfe again saw respondent, and pressed the question of the fees. Thereupon, respondent determined to go to Nashville, and see the officers of the bank; and, on the 7th of March, 1865, in Nashville, saw O. Ewing, and D. Weaver, President and Cashier. Respondent told them that Hume had informed him that they wished to pay him a sum in gross to wind up the affairs of the bank at Clarksville. Weaver said this was a mistake; the bank wished to pay a per centage, and this to be governed by the *546 amount actually collected. Respondent informed him that the bank could make no such arrangements with him; that doubtful claims gave an attorney more trouble, and required more skill and attention, than solvent claims, and that he would accept the business upon no contingency as to fees. Weaver, thereupon, insisted that respondent should make a proposition in writing, and he (Weaver) would lay it before the managers of the bank, and consult leading attorneys at Nashville.
Thereupon, on that day, (March 7th, 1865,) respondent submitted the following, in substance: “All cases at law that are not litigated, five per cent.; and all litigated cases at law, ten per cent. However, in cases that are regarded as insolvent, and the bank merely desires its claims reduced to judgments, and I have nothing to do but reduce the claim to judgment, two-and-a-half per cent, will be charged; but the bank, or its officers, must select or point out such claims to the attorney. No fee, however, before a Justice of the Peace, shall be less than $10, and no fee in the Circuit Court shall be less than $15. All cases in equity, when not litigated, five per cent.; and all litigated cases in equity, ten per cent. No fee, in the Chancery Court, however, shall be less than $30. In appeals from the Circuit Court to the Supreme Court, when not litigated, two-and-a-half per cent.; and in litigated cases, appeals from the Circuit to the Supreme Court, five per cent. In appeals from the Chancery to the Supreme Court, when not litigated, two-and-a-half per cent.; and when litigated, five per cent.; how- • ever, no fee in the Supreme Court shall be less than $30.
*547 “For writing mortgages and deeds of trust, one-half the rates as fixed by the schedule of attorney’s fees, adopted 10th June, 1864, will be charged; also, for taking depositions, one-half the fees charged therein. No counsel, or advice, to be charged for in cases not litigated.
“The above embraces all suits in Montgomery County; claims outside of that county must be governed by the regular schedule of fees. I, however, will abate upon the schedule, whenever I can. If the above proposition does not suit the bank, the following is submitted for its consideration: I will charge ten per cent, upon all claims that may come to my hands, and will attend to them in any and all the Courts of our State, to-wit: Justice of the Peace, Circuit, Chancery, and Supreme Court; and no additional fee will be charged in any of the Courts, however long and severely litigated, and whether or not more than one suit may be brought on the same instrument; nor will I charge anything for writing mortgages, deeds of trust, taking depositions, or anything of the kind. The ten per cent, is to cover all trouble, and all suits, and all Courts. The bank to pay all necessary expenses, and any fee over the ten per cent. I may have to pay any attorney at a distance; but, in making this latter proposition, the bank must place all its claims of every sort, collaterals, etc., into my hands, and not select out claims.”
The answer states, that this proposition was handed to Weaver; and in a day or two subsequent, Weaver stated to respondent that the Board were not prepared to accept the proposition; and thereupon (March 8th, *548 1865,) Weaver wrote Hume, in substance, that Horn-berger’s proposition had been rejected by the Board, and ordering Hume to make up a detailed list of notes and bills, and bring the same to Nashville; that Tie was desired to be present, that his views on every piece of paper held by the branch may be obtained. Respondent further states, that in returning home, he wrote Hume of the two propositions he had made, and had left both with the Board for its reconsideration; and he had, upon reflection, come to the conclusion to withdraw the latter, to-wit; the ten per cent, proposition, and that the bank might regard nothing before it but the first proposition; and this letter, it is stated, was forwarded to Nashville. Said answer' further states, that, on the 4th of April, 1865, Weaver wrote Hume as follows: “See your lawyers; and if any of them will agree to take charge of such paper as we wish to sue on, and charge us five per cent, on collections, you are hereby authorized to employ them. We prefer giving our paper to a lawyer of your place to employing one here. As the currency is rapidy improving, lawyers should begin to lower their charges.”
The answer alleges, that this proposition was submitted, by Hume, to respondent, and declined by him— Hume stating that 7m would permit respondent to select such paper as he thought he could collect, and pay him five per cent, upon the amount actually collected, but would allow nothing upon such amounts as might not be collected; which respondent declined, stating, among other things, that he would, in all cases, do his whole *549 duty, and expected to be paid, whether the bank collected or not; that such contracts as was proposed were not sanctioned by the policy of our laws, and were champertous.
On the 4th of April, respondent wrote to Weaver, to know if he was still regarded as the attorney of the bank upon the attachment bills filed in 1864; stating, also, that he had filed the bills upon memoranda furnished him, and did not have the notes; that he foresaw difficult questions of law arising, and that the entire paper sued on had better come into the hands of one attorney. Accompanying this was a printed letter, stating, in substance, the schedule of fees adopted on the 10th of June, 1864, and calling Weaver’s atten tion particularly to the terms of said schedule, as regards payment of fees in advance, etc., etc.
On the 6th of April, 1865, Weaver replied, in substance, “the bank does regard you as its attorney upon all the papers upon which you have taken attachment, as well against the makers as indorsers.” On the 8th of April, Weaver wrote to Hume to see respondent, and ascertain if he would not modify his proposition, made in Nashville; respondent says, after consulting with the bar at Clarksville, he wrote to Hume, on the 10th of April, 1865, as follows:
“The bank and myself are both peculiarly situated; when our schedule was adopted, I had the bank specially exempted from its provisions, but this exemption was granted to me, and not to any other member of the bar. Had the bank not been exempted, I could not, *550 nor can any member of the bar, honorably deflect from the rule; This being so, and, as I alone can treat with the bank, I am disposed to be liberal towards it. I have, therefore, assembled the principal members of the bar, and, after full consultation with them, have concluded to modify the proposition made at Nashville, though the bar thinks that the Nashville proposition is sufficiently low. My object, if possible, is to satisfy the bank, and not be attorney for and against it in the same Court, where the same principles of law are involved. For the bank cannot surely expect me, if it places its business in the hands of another attorney, not to take fees against it. In those suits I, therefore, desire to represent but one side, and think it to the interest of the bank that I should not. I am, also, - of the opinion that it is not to the interest of the bank to employ an attorney at Nashville. Such being my'feelings and views, I submit the following modified proposition :
“All unlitigated cases at law, four per cent. All litigated cases at law, eight per cent. All unlitigated cases in equity, four per cent. All litigated cases in equity, eight per cent. All unlitigated appeals to the Supreme Court, two per cent. All litigated appeals to the Supreme Court, four per cent.”
The old rule with the bank was as follows, to-wit:
“All unlitigated claims at law, two-and-a-half per cent. All litigated claims at law, ■ from seven-and-a-half to twelve-and-a-half per cent.; generally ten per cent. All unlitigated cases in equity, from five to seven-and-a-half *551 per cent. All litigated cases in equity, from seven-and-a-lialf to twelve-and-a-half per cent. All fees in the Supreme Court, at the discretion of the attorney.”
“It must he remembered that at the time this rule was adopted, paper money was at par with gold, and the price of living several hundred per cent, cheaper than now. I write this that the bank may see that I am not disposed to be illiberal with it. I am exceedingly inclined to accommodate myself to the bank; and if the above modified proposition does not suit it, let it make one. It certainly cannot expect me to work for nothing. I am not willing to select out papers. I desire to take charge of the whole paper; and, if possible, make every dollar due upon it. However, such paper as the bank may regard as insolvent, I am, if not litigated, willing to reduce to judgment for one per cent., or for nothing. My opinion, from the slight examination that I gave the claims of the bank, soon after my return from Nashville, is, that there are very few, if any, that may be regarded as insolvent; though some of them will require vigilance and attention. The very fact that you and the bank are so anxious for me to have the business, (the whole of it, as you say,) and the fact that no other attorney here is privileged to deflect from the schedule, inclines me to put my fees even lower than I think they should be — then I do not desire to be for and against the bank, where the same principles of law come up. It therefore seems to me, all things considered, that the bank should accept my Nashville proposition. It ap *552 pears to me that the hank views me merely in the light of a simple trustee, receiver or collector; that is, an attorney who can merely issue a writ, file a declaration, calculate interest, give a receipt, and pay over money. I have a recollection of just such cheap hank attorneys here, and they were dear attorneys in the end. If the hank is hunting for an attorney of this sort, it can find him; hut before it is through with its litigation, it will he hunting for a real bona fide lawyer, regardless of prices; and in place of paying one attorney, it will he paying two or mope, as it did in some other days. I am clearly satisfied that much of the business here will require not a mere collector, hut a lawyer, and one of vigilance and attention. If the hank can get along with its litigation here, and have hut one attorney to pay, it will he doing well. It should not, therefore, be hesitating with an attorney who is satisfactory to it, if his charges are within reason. It must remember that our Courts will he crowded with business, and every attorney fit to take charge of business will have as much as he can do, at prices or rates greater than the bank offers. This being so, I am clearly of the opinion that the hank should accept my Nashville proposition, as though the modified one had never been made. However, both propositions are before it, and it can do as it pleases. The bank should carry the heart as well as the head of the attorney into its business, and not desire, in any respect, to paralyze his usefulness to it. I wish to do what is right in this matter, and, if I know myself, *553 will do it. Let tbe bank meet me with the same generous spirit, and we will lock arms and go together.”
On the 17th of April, 1865, Weaver wrote Hume as follows:
“In reply to Hornberger’s letter of the 10th inst., and yours of the 11th, we accept his proposition, viz: All unlitigated cases at law, four per cent.; all litigated cases at law, eight per cent.; all unlitigated cases in equity, four per cent.; all litigated cases in equity, eight per cent.; all unlitigated appeals to Supreme Court, two per cent.; all litigated appeals to Supreme Court, four per cent.”
The answer and cross-bill further alleges, that, in pursuance of this agreement, all the assets, amounting to more than five hundred thousand dollars, came into the hands of respondent, and says, at the time the claims came to the respondent, he (Hume) said the fees were to be in cash, and he would pay them if he had the money, but that he had sent all the money to Nashville, and respondent would have to apply there. This was April 22d, 1865. On the 22d of May, 1865, the respondent wrote to Weaver that he would need $6,000; and, in addition, this letter stated: “I enclose you the rules of our bar. According to them, and our arrangement, I would have the right to call upon the bank for two per cent, on all amount of claims placed in my hands. This I do not desire to do, unless the bank should prefer to pay it. etc., etc. I prefer giving my individual note to the bank for the amount I need. However, should the bank prefer making an absolute pay *554 ment, I -will receive it as such. I will state that I have collected no fees from the hank for some time before the war. In addition to this, upon the attachment bills filed last March was a year, and upon the bills filed this year, and as security for costs, I am upon the bonds of the bank as security for an immense amount. Should the bank, however, prefer to pay all fees due to date, I will, so soon as I have time, make the same out. I state this, as the bank seems desirous to wind up, as I see from a letter to Mr. Hume.”
To this, on the 24th of May, 1865, Weaver replied: “If you will send your account of past fees, we will pay it.”
On the 25th of May, Hornberger replied: “I will draw off my account for fees due, so soon as I can; and I will send it to you for payment.”
On the 14th of June, 1865, among other things, Horn-berger wrote, in substance, that, owing to press of business, he had not made out the accounts, but stated that he needed $2,000, “and am compelled to call upon you for this amount. You will please send the same in drafts on New York, for five hundred dollars each, and charge me with the same until I have time to make out the accounts; or, if preferred, will send my receipts for the same.”
On the 16th of June, 1865, Weaver wrote as follows: “Please find inclosed our four checks in your favor, on Manhattan Company Bank, of New York, $500 each, $2,000 to debit of your account. Please send your receipts for same.”
*555 On the 3d July, 1865, the hank made an assignment of all its assets, to secure, first, the holders of the issue; secondly, the creditors generally, pro rata; and on the 26th of July, 1865, respondent came to Nashville, bringing with him the promised accounts, and demanded payment. Weaver paid him $4,000. Respondent then asked to be released as surety upon the attachment and injunction bonds, which was refused. On the 27th day of November, 1865, respondent wrote to Weaver that he held some §50,000 in greenbacks and Planters’ Bank money, and desired to be released; but set up his claim as an attorney for fees, and claimed that this lien was prior to the assignment; also, sets up his right to hold the funds in his hands, until he should be released from the bonds, or indemnified. Respondent then made a visit to Nashville, and had an interview with Weaver, in which the whole matter left open in the foregoing correspondence was talked over, but which resulted in nothing satisfactory.
Various correspondence here ensued, as shown in the answer and cross-bill, but all of which relates to the original understanding and agreement — is a recapitulation of the foregoing, save that in a letter dated January 6, 1866, respondent sets out the amount then due him, as follows:
Old account of Hornberger & House.§ 2,209.10
On account of attachment bills filed between March 15, 1864, and March, 1865. 5,466.45
Account for equity cases since the papers were handed over. 6,342.02
*556 Account for cases in law since business was banded over. 36,172.47
Account for defending cases at law. $2,038.81
Account for defending cases in equity. 100.00
Oases in Supreme Court... 83.45
Total,.$52,412.30
Credit by amount paid, and interest. 6,168.33
$46,243.97
of which sum $38,568.42 arose as fees on the new business. And in this same letter it is suggested that, by the schedule, respondent would be justified in charging the commission for suretyship for the bank, and this would make the fee some $10,000 more; and while this was no part of the present account, yet it would be charged, if the foregoing sum was not paid; also, said letter suggests that the bank will have to pay two or more fees on many of the cases; that, after judgments at law, bills would have to be filed in equity, to set aside fraudulent conveyances, etc., and this would induce a duplicate charge.
To this letter Weaver replied, January 11, 1856, in substance, that he would expect Hornberger, as the attorney of the bank, to pay over all moneys as soon as collected, and all fees should be paid on the amount thus paid over, at the time of the payment of the same; also, that he (Weaver) was ready, at any time, to give an obligation to save respondent, or any other person, for all security for the bank.
*557 Here follows a correspondence of several letters between tbe parties, in which each proposes to stand by the contract j but each discloses a misunderstanding of its terms by the other — Weaver insisting that the schedule of the Clarksville bar had nothing to do with the contract; that it was specially exempted from the operation of these rules — Hornberger insisting that by these rules all fees were to be paid in advance, and states that neither he nor Hume “ever dreamed that the bank wanted the fees on a credit.” On the 20th of February, 1866, Weaver writes as follows:
“I shall reply briefly, but shall endeavor to be explicit and respectful. Firstly, then, I have to say that you did bring with you to Nashville, in 1864, a printed schedule of your Clarksville bar, and that on that occasion we stated to you, distinctly and emphatically, that we would not employ an attorney for the bank and agree to pay him his fees in advance of his collections; and in nothing that we have ever said or written have we intended to convey any other idea, etc. Hence our surprise when you demanded of us thirty or forty thousand dollars, and subsequently increased it to about sixty-two thousand dollars, for fees, when you had not reported a single collection to us; nor had you paid us one cent on any claim in your hands. Secondly, our arrangement with you, as we understood it, is, in substance, as follows, viz: The bank to place all notes, bills, etc., for collection at Clarksville in your hands, as its attorney, and you to be paid for collecting and paying over the same, four per cent, on all unlitigated cases at law; eight per *558 cent, on all litigated cases at law; four per cent, onfall nnlitigated cases in equity; eight per cent, on all litigated cases in equity; two per cent, on all unlitigated appeals to the Supreme Court; four per cent, on all litigated appeals to the Supreme Court. These are the terms on which we supposed we had employed you. They are the terms on which we are ready and willing to settle with you, as fast as you make collections. We want no credit; whenever you report the collection of a claim, and pay over the same, your fees will he paid in par funds at the time. And in relation to the appeal cases in which you and others are on the bank’s bonds, we refer you to our previous letters. If the bank owes you an account previous to our arrangements above referred to, make it out, and if Mr. Hume says it is correct, we will pay it. And now, in conclusion, we respectfully request you to say whether you proceed with the business of the bank on these terms, or not. I respectfully decline any further controversy on this subject.”
In reply, on the 24th of February, 1865, Mr. Horn-berger says, that he incloses the account of Hornber-ger & House, and, also, his own account previous to the arrangement; asks that the money be deposited in the Third National Bank, at Nashville, and certificate inclosed; says, further, “I will merely state that I do not agree with you in your construction of our contract; a contract of the character implied in your letter, would be champertous, and, if this was the fact, and known to the Court, bar or litigants, every suit that the bank has in Court, both law and equity, at *559 tachments and injunctions, and all, would be dismissed, tbe bank taxed with the costs, and I would be striken from the roll,” etc., etc. This letter, after discussing the matters of disagreement, concludes : “ I will merely state, that you are surely mistaken, in every one of your positions, as asserted in your letter. I cannot agree in a single one of them. We had better, therefore, agree to disagree, and let the Courts settle all matters between us. I see no other alternative.”
On March 15th, 1866, Hornberger again writes, that he had collected, in Planters’ Bank money, $52,921.20, and in greenbacks, $4,546.85, making a total sum of $57,438.05.
Here ensues a correspondence relative to “ understandings and misunderstandings” of the respective parties as to the contract, and this is kept up until May 17th, 1866, when James E. Baily, as the agent and attorney of the bank, enters into the correspondence; and, in the correspondence that ensues, Hornberger states that he had made out an account of fees, amounting to $25,440.73; that there was about $535,000 of notes, etc., passed to him by the bank, inclusive of interest and damages in these notes, and that the fees are based upon the per centage on $658,883.13; this sum, embracing about $100,000, being the per centage on the second action on the same paper to that amount, and for defending suits against- the bank to about $25,-000.
On the 9th of June, 1866, the bank offered respondent $15,000 as a compromise, and proposed to relieve him of all obligations upon bonds, which was refused.
*560 ; Tbe answer and cross-bill further discloses, that respondent bad collected to this time, in Planters’ Bank money, $81,126.03; in greenbacks, $4,516.88; that be bad paid to tbe bank, in Planters’ Bank money, $10,-902.70, and tbe balance was deposited in tbe First National Bank, at Clarksville; and that debtors and parties bad paid to Weaver, under the orders of respondent, about $19,644.88, making in all collected, and in which be was instrumental in collecting, $105,287.69, since tbe 16th of May, 1865.
Tbe cross-bill prays a specific performance of tbe contract, and that all liens be enforced; also, general relief.
In answer to tbe cross-bill, Weaver says that, at no time, was it ever understood that tbe schedule of tbe Clarksville bar was agreed upon or adopted, in whole or in part, as a portion of tbe contract; but tbe same was, early in the negotiation, repudiated as exorbitant; and especially was that feature of it which required fees to be paid in advance, as, by that rule, tbe lawyer employed might die, and fail to perform tbe service; that tbe amount to be put in suit was about $400,000 and interest; that it was desirable to put tbe whole in tbe bands of one lawyer, and pay him tbe commissions agreed upon at the time of the collections; that Hornherger stated that be was exempted from tbe operations of tbe schedule, so far as tbe bank was concerned; and was at perfect liberty to treat with tbe bank independent of that schedule.
This answer states, that tbe letter of tbe 10th of April, 1865, forms tbe basis of tbe contract made, and *561 that the same was accepted and understood as an agreement to collect the claims for the per centage specified —to be paid at the time of the collection; that this proposition was regarded as high; but the bank was mainly induced to accept it because no lawyer of the bar was permitted to treat for the business, on any terms independent of the schedule; that the bank was so informed by Hornberger himself, and subsequently by Mr. Hume, when he was written to, to see the other lawyers.
The answer further states, that the bank had recently, and for the first time, been informed that one member of the Clarksville bar did agree with Mr. Hume to accept the business, upon a commission of five per cent, on collections; but such member afterwards, believing that he too was bound by the schedule, although he had settled in Clarksville since the schedule had been adopted, had withdrawn his proposal; that it was believed that the commissions which Hornberger would receive, would amount to $25,000, after Hume sent a list of the debts due the bank, with comment as to solvency; in which belief the officers of the bank were strengthened by the representations of Hornberger; and trusting to these, the notes were ordered to be handed to Hornberger; that it had been the uniform custom oí the bank, and the country, to pay after the services had been rendered; that the letter written to Hume in August, 1864, related to the payment of past fees of Horn-berger & House, and did not direct Hume to pay fees when the claims were “handed out,” but “to pay debts *562 as they accrued,” instead of leaving them to accumulate; that the subsequent correspondence in regard to the payment of fees was so shaped and worded by Hornberger, by reference to his present necessities, in explanation of his reason for wanting money, as to assuage his application from a demand for money due him, to an advance to relieve his necessities; and that at no time did he understand the reference made by Hornberger to the schedule on this point, as referring to other than fees that were due him on the old contract; that these might be construed with reference to the time of their payment to come under the schedule, but that he could not have possibly understood it as referring to the fees under the new contract, as the schedule was wholly excluded from this; and that any agreement that he (Weaver) had made to settle his (Hornberger’s) account, referred alone to the old account of Hornberger & House, the claims of 1864; together with his commission under the new contract, so far as he had collected the money; that he asked him what was the amount of the account, and when told that it had not been footed up, but that it would amount to $40,000 or $50,000, he (Weaver) expressed at' once his entire dissent, surprise and disapproval. This answer denies Hume’s authority to act or make any contract with an attorney, other than was specially given in the letter to him; that more than one-half the claims are insolvent; that quite all are litigated; that different suits are brought against several parties to the same note, or bills, and each of said suits sought to be charged- with the per centage.
*563 That these constructions of tbe contract were so different, the charges so unreasonable, it was thought best to dissolve the relation. That the bank now, and at all times, is ready to pay all reasonable fees, and release, by the execution of other, or indemnity bonds, said Hornberger and all other parties as its sureties.
We have quoted thus liberally from the pleadings in order to set out, by reference to what was proposed and discarded previous to entering into a contract finally, the views of each party at the time it was entered into; also, to allow each party the full benefit, in his own language, of a construction of the contract, and to appreciate the differences and disagreements that^ arose under the same.
It appears from the record, that, at the time the schedule was adopted, there were but four attorneys of the Clarksville bar practicing, the others being in the South; that, subsequently, one of these went upon the bench, and one or more were employed, or had been retained, to defend any and all suits against the bank; that another attorney (Mr. Rice) came to the bar in April, 1865; to this gentleman Hume applied to know upon what terms he would undertake the business of the bank. This gentleman called at the bank, and looked over the bills and notes, and explanatory comments prepared by Hume on the margin, and was requested to put his proposition in writing, as it would have to be sent to Weaver, at Nashville, which he did. This proposition was to receive five per cent, on all collections, and three per cent, on all judgments from *564 which no money was realized, and was delivered to Hnme unsealed.
After this proposition was given to Hume, Mr. Horn-berger, and another member of the bar who had agreed to the schedule, but who had been retained by the debtors of the bank, called upon Mr. Rice, and Horn-berger told him that Hume had told him of the proposition, and Hornberger remarked that he was negotiating for the business of the bank, and that he wished witness to withdraw his propositions; that there had been a meeting of the bar some time before, and they had agreed to charge certain fees, set out in a schedule; and that it had been agreed, at the time, that the business of the bank should be excepted from the schedule in favor of him (Hornberger), and that he was to have the exclusive privilege of proposing for that business on terms outside of the schedule; and that no member of the bar was at liberty to make any proposition while he was negotiating for it, and seemed to regard the action of this attorney as an unprofessional interference. Thereupon, witness and Hornberger went to the bank and withdrew the proposition before it had been forwarded to Weaver.
The original bill, in effect, seeks to set aside the contract, and allow a quantum meruit recovery. The cross-bill seeks a specific performance of the contract; and this latter the Chancellor decreed.
In announcing the conclusions of the Court, we will not discuss, severally^ the various reasons and arguments that have been submitted at the bar — why, on the one *565 Rand, the contract should be rescinded; or why, on the other, it should be specifically performed.
Let us ascertain what a party is required to show in order to have a contract rescinded and annulled; which contract is sought to be enforced by his adversary. As between parties that are compos mentis, no fraud appearing, no fiduciary relation existing, but treating with each other at arm’s length and on equal terms, a contest between two judgments as to present and future values, bare inadequacy of price would not be sufficient; but if the disproportion between the value of the thing and the consideration given was so great as to become shocking to common sense, and very gross, the Courts would set it aside, not because of actual fraud, any more than for want of capacity, but because of the bare injustice of the transaction, so apparent, that no Court, administering justice, could conscientiously permit it to stand. Such an inadequacy is equivalent in law to fraud, or equivalent to incapacity, and the effects are the same. Now, if we alter the capacity of the parties — reducing one below the ordinary, so that he descends in quantum of capacity towards the condition of the fool or lunatic — the vigilance of the Court becomes aroused, its scrutiny awakened, and less inadequacy of price will induce it to give the relief of recision or cancellation. The deeper the one party has sunk towards mental imbecility, the greater becomes the duties and responsibilities of the Court to relieve and protect him, and the greater vigilance it is called upon to exercise to this end; so *566 ■when lie shall have fallen into complete incapacity, the act becomes ipso faoto void, or voidable, without any inquiry into the terms of the contract, or the adequacy or inadequacy of the consideration. So is the rule in regard to contracts between parties occupying a fiduciary relation to each other. Inadequacy of consideration between these will be looked to, it is true, and a very slight inadequacy added to a remote fiduciary character, would be sufficient to order a recision; as the fiduciary relation draws nearer, and the confidence and trust reposed increases, adequacy and inadequacy of consideration diminishes as an element of which the law will take hold to grant relief, until finally these cease to have any consideration, and there arises a more absolute principle of law, decisive and peremptory. The relation is such between the parties, that the law interdicts all .trades between them. Such are the relations between guardians and wards, lunatic and committee. The principle is, that the greater the confidence, the more confiding the trust, the more absolute the dependence of the one party, and consequently the easier it would be to the other party to acquire an advantage, the more strict the law becomes, and the greater protection it affords the dependent party. Whether the dependence arose from imbecility or from a necessary legal relation of a fiduciary character, it matters not; the legal effect is the same, the only difference being in the cause.
This brings us to the consideration of the relation of attorney and client; and in- this we have derived *567 great aid from English decisions, as well as those of our own Courts, and a review of these decisions shows most conclusively that the relation is one of great delicacy, extremely fiduciary in its character, and he who has strictly guarded against committing any breach of it in the course of a long practice, has continually cultivated the highest virtues of his nature.
In the case of Middleton vs. Wills, 4 Bro., P. C. 245, it was decided that “it is an established rule in Courts of Equity, that no gift or gratuity to an attorney, beyond his fair professional demands, made during the time that he continues to conduct or manage the affairs of the donor, and more especially if such gift or gratuity arises immediately out of the subject. Then, under the attorney’s management, will it be sustained.” In 1 Cox, 112, it was held that in such a case, proof of actual fraud was not necessary. Any gift to an attorney by a client, during the pendency of the litigation, will be set aside; 2 Ves., 259; 18 Ves., 302; 4 Hay., 291. If an attorney agrees with his client to receive for his services exorbitant or extraordinary reward, the Court will set it aside, or reduce it to the standard of those fees to which he should be reasonably entitled. Sanderson vs. Glass, 2 Atk., 296. Independent of fraud, an attorney shall not take a gift from his client while the relation exists. Wright vs. Proud, 13 Ves., 138.
In Matthews vs. Wallwyn, 4 Ves., 119, a settled account between a solicitor and client was opened and reviewed, upon the general allegation of the client of *568 error, though no specified errors were pointed out in the hill.
In the case of Ballou vs. Russell, 1 Ball and B, 96, it was decided that all dealings between attorney and client are anxiously scrutinized in equity, in order to protect the client from his own acts, done under the influence or ascendancy which an attorney acquires over him.
In the case of Wood vs. Downes, 18 Ves., 120, the Court decided, that, “beneficial contracts and conveyances, obtained by an attorney or solicitor, from his client during their relation as such, and connected with the subject of the suit, will be decreed to stand as security only for what was actually due; and such purchases will be declared a trust. On a question of the propriety of a purchase made by an attorney from his client, in the case of Myrick vs. Edwards, 2 Hare, 60, the Court declares, that it is the general rule that the onus of showing the transaction to have been fair, lies upon the solicitor.
In the case of Todd vs. Wilson, 9 Beavan, 486, a cestui que trust and trustee (the latter being a solicitor) had a full settlement of all accounts; and the latter charged for professional services in the' management of the trust, and a general release was executed; but as the cestui que trust did not have any other solicitor or legal adviser present, to aid him in the settlement, the Court, upon a bill filed subsequently, relieved the client of all professional charges, beyond costs out of pocket.
In Jones vs. Roberts, 9 Beavan, 419, an account had *569 been settled between attorney and client, and a security tendered and accepted by the solicitor, while the Court viewed with great jealousy and vigilant scrutiny the transaction, it was decided that it should not be treated as an absolute nullity.
Chancellor Walworth, in the case of Howell vs. Ransom, 11 Paige, 540, says: “From the relation of attorney and client, which existed between the complainant and defendant, it was not necessary to prove actual fraud on the part of the attorney; and if the Court is not bound to set aside the contract of sale in such cases, the whole burden of establishing the fairness of the sale, and that it was made upon full and adequate consideration, is at least upon the attorney. The attorney can never sustain a purchase of this kind without showing that he communicated to his client everything which was necessary to enable him to form a correct judgment of the actual value of the subject of the purchase, and also as to the propriety of selling it at the price offered, and the neglect of the attorney to ascertain the true state of the facts himself, will not sustain his purchase.”
In the case of Starr vs. Vanderheyden, 9 Johns., 252, the Court say: “The Court, from general principles of policy and equity, will always look into the dealings between attorney and client, and guard the latter from any undue consequences resulting from a situation in which he may be supposed to stand unequal.” And the Judge, in giving in the opinion of the Court, cites with special commendation, the remarks of the Lord Chancel *570 lor, in Newman vs. Payne, 2 Ves., 210, saying: “It is put commonly upon one of tbe cases wbicb bold that, upon general considerations of policy, tbe Court, without entering into tbe means used by tbe attorney, or tbe personal character of tbe parties, but merely upon tbe relation of attorney and client, will order all transactions to be opened between tbe parties; for it is fit that they should be inquired into, and tbe law would be defeated, if, by reason of any security given, or settlement made, an inquiry was precluded.”
In tbe case of Lewis vs. Morgan, 5 Price, 42, tbe complainant was himself a barrister, and Alderman and Magistrate of tbe City of London, bad been Sheriff and Mayor, was an excellent accountant, bad closed up all bis transactions with bis attorney; wbicb transactions related to professional services and money loaned, and receipts bad been passed between them; besides, tbe bill was not a strong one, in its allegations charged errors in tbe general settlement, but pointed out no specific errors. Tbe Judge says: “This is a case of attorney and client; an attorney has often been described to be an offieer of tbe Court, and in that character responsible for tbe protection of bis client from all acts wbicb may prove detrimental to him. It is bis duty to apprise him of tbe legal consequences of bis actions; and decreed tbe settlement to be opened and reviewed.”
These cases, and many others, indicate too clearly, tbe high and delicate relations that an attorney sustains to bis client; and while these cases are not cited by tbe Court as cases selected from tbe great mass of *571 learning on this subject, to be specially approved in every part, and upon the facts of each — yet they serve as sources whence to draw a few general principles; which principles are, that a person standing in relation to another of attorney and general manager and director, and having procured such party to execute an instrument or contract, by which such attorney is to be benefited; and this contract, or written instrument, becomes afterwards the subject of litigation between the parties, and is assailed by the client, that it becomes the attorney, not merely to rely on the written contract or instrument, but to show all the facts necessary to sustain it as a paper of high merits; and to do this, he must show chiefly that the client understood the whole matter ad item, was fully and completely informed of the nature, result and consequences of the instrument or contract; was advised, with the highest good faith, (uberrima fides,) of each and every circumstance likely to influence his mind or feelings against the execution of the paper; and more than this must he show, namely: that he has informed himself of all the facts necessary to give his client full information, and in the greatest freedom has imparted it to his client, together with such legal knowledge of the consequences of the same, and its true legal construction, so far as the client might command his legal knowledge in the same matter with a third person, and to the same extent that the law imposes it upon every attorney — to impart to his client the legal consequences of his acts.
An attorney is a man set apart by the law, to ex *572 pound, to all persons wbo seek him, tbe laws of tbe land, relating to bigb interests of property, liberty, and life. To tbis end, be is licensed and permitted to charge for bis services. Tbe relation be bears to his client implies tbe highest trust and confidence. Tbe client lays bare to bis attorney bis very nature and heart, leans and relies upon him for support and protection in tbe saddest hours of bis life. Knowing not which way to go to attain bis rights, be puts himself under tbe guidance of his attorney, and confides that be will lead him aright.
In an affair between a client and a third party, it would most certainly be tbe duty of an attorney, not only to relate to bis client all tbe facts relative to tbe subject matter, but to explain tbe nature of tbe obligation be was about to assume, and its effects and legal consequences upon him personally, as well as upon bis estate. If tbis be true in tbe character of case supposed, bow much more is it tbe duty of an attorney himself, dealing with bis client, to make a just, fair and reasonable contract; and have it declared in terms incapable of ambiguity, free from complications and involvements, and which no intelligent and reasonable man can fail to comprehend. Contracts are not unfrequently things of items and parts, connected and disconnected, and to each item and part there must be a mutual assent of minds.
If a written contract was susceptible of two constructions, fairly and reasonably, and tbe one mind assented to it upon tbe one construction, and the other upon tbe other construction, tbis would be no contract at all be *573 tween the parties; and were it a contract between attorney and client, it would be the duty of the attorney to inform the client of the fact of its susceptibility of two constructions; and, having pointed out this liability of the contract, proceed to know, definitely and clearly, bis client’s views, before proceeding further.
An attorney, dealing with bis client for further professional services, and the contract is reduced to writing, is bound to show, when be seeks to enforce it, that the latter fully understood its meaning and effect, and that each understood it in the same sense, otherwise it cannot be enforced.
In the case now under consideration, the defendant in the original bill was, and bad been, the counsellor and attorney of the bank, and, at the time be was so acting, was treating with the bank for another and much larger professional engagement. The contract is made between him and the bank, through the medium of its principal officer, the Cashier, and all the terms proposed were reduced to writing, and inclosed in communications. The real client was the corporation, and it was the duty of the attorney to guard and protect this client even as against its Cashier or other officer, and see that it did not suffer by an improvident contract made by such officer, certainly with himself.
The rate of per centage agreed to be paid the attorney seems, from the letter of the 10th of April, 1865, (and which letter, by common consent, is presented to the Court as containing, in a tangible form, more of the contract than any other,) to be based up *574 on ‘‘litigated and unlitigated” cases. Now, upon this contract there was passed over to the hands of the attorney about $500,000 of bills, notes, etc., with and without indorsers, who were also, where it was necessary, to be proceeded against as well as the principal. In a large number of cases all the parties to this paper were insolvent. In other instances, the paper was secured by collaterals; and these also went into the hands of the attorney, and are included in the above sum.
One of the differences which arises upon this contract may be thus stated: Suppose the attorney sues the principal on the’ note in one suit, and the suit is litigated, but he obtains the judgment, but can procure no satisfaction, of the execution, and is allowed his commission of eight per cent, on the amount; and he then deems it necessary to sue the first indorser, but has the same result, and is allowed the same commission of eight per cent, for this service; he finally sues the second and third indorsers, each, in separate actions, and with like success as before. Here we have allowed the attorney thirty-two per cent, of the whole amount, and no practical benefit has been achieved. Now, suppose one or more of these parties to appeal to the Supreme Court, and it is here litigated; here is another allowance to the attorney, under the contract, of four per cent, on each appeal; or suppose, after the judgment at law against one or more, he deems it best, in order to procure satisfaction, to file one or more bills against the respective parties in a *575 Court of Equity to set aside conveyances for fraud; here, again, in each case, be would be entitled to claim eight per cent.; and the same result is obtained when we apply the terms of the contract to the paper secured by collaterals. Now, this would be the practical result of the contract if it be applied as contended for; but when we- weave into this the schedule, with its complications and involvements, as it is contended should be done, and allow a per cent, for suretyships and the other items of charges allowed by it, and then think of the whole being paid in advance, if it were possible to know what sum the contract would work out in favor of the attorney beforehand, the transaction becomes appalling, and the geometrical proportions of increase of the fees astonishing. If such had been the full, clear and definite understanding of the contract between the officers of the bank and the attorney, it would not be allowed to stand one moment as against the bank in any Court of Equity.
The character of the gentlemen engaged in this transaction, forbid that it should be so interpreted, as well as their relations to the corporation, (each its agent for many years;) and yet such can be its practical workings and result. We can readily suppose that the officer of the bank, by whom this contract was made, by not making the proper distinction between “cases” and “claims,” which was the duty of the attorney to point out, could have believed that the contract contemplated to allow eight per cent, on all litigated claims put into the hands of the attorney; and if the litiga *576 tion was brought to this Court, four per cent, additional, making twelve per cent, upon all litigated claims, and four or more upon all not litigated; and even at this rate, the contract would have been highly beneficial to the attorney, and could not, under any circumstances, have paid him less than $25,000 or $30,000; and as the claims all came from one source, partook of a common character, the litigation involved in one case would have solved the difficult legal questions of many of the others. But the grand result attained upon almost any construction of this contract as it stands literally, being, at the least, and necessarily, $25,000 or $30,000, with power given by it to the attorney to swell it to $60,-000, or more, at discretion, by reason of the “cases” he might choose to bring — all coming from one client —and which, in the course of any reasonable and fair progress in the. litigation, would end in two or three years, induce us to apply the strictest rules that attain in the practice of the Courts of Equity between attorney and client. To say nothing of the agreement at the time of making the schedule, that respondent alone should be permitted to treat on other terms for the business of the bank, 'and the application of the obligations of the schedule to Rice, at the time he was treating for this business as a competitor, of which the bank was uninformed at the time the contract was closed, we think there is sufficient in the contract itself, and in its practical workings upon items, and “cases” “litigated and unlitigated,” with the reservation of power in the hands of the attorney to increase his remune *577 ration to an exorbitant demand, and to execute tbe contract at bis own hands, by his liens and right of retention, to set it aside, without inquiring for fraud, actual or constructive, either in the manner by which it was attained, or the manner in which it has been executed thus far: but acquitting all parties of all character of fraud, we think the contract is ambiguous, indefinite in its consequences to the client, susceptible of constructions that would lead to unconscionable advantages and ruinous consequences; and the differences and disagreements now apparent, and to which it has led, springs necessarily and legitimately from the contract itself, and must entail disaster upon the corporation, if it is permitted to be executed. We think the recovery of the attorney should be scaled and brought to a quantum meruit. We cannot conceive how a contract of the character of this, without am express stipulation, distinctly made to that effect, could induce the belief that the fees were to be paid in advance. The amount of the fees is not determined until the “case” is tried, as the rate of per cent, is made to turn on the question whether the case will or will not be litigated; besides, engagements with counsel are personal trust and confidence in the talents, skill and business tact of the counsel selected; and in case of his death, or inability to perform the contract, the client would lose that for which he contracted, to-wit: personal service, which might not be supplied by substitution, and no client could be compelled to submit to the substitution.
*578 We, therefore, declare that, in all cases where the relation of attorney and client exists, and it is desired to make further professional engagements:
1st. That it is the duty of the attorney to have the contract (if there be one) clearly and definitely stated, and understood, not only in its language; but, also, in its spirit, legal consequences, and practical results.
2d. That the means used to obtain'.the contract be free, not only of fraud, actual or constructive; but, also, of any other inequitable consideration.
3d. That every material circumstance, or fact, connected with the execution of the contract, and calculated to inform the client of his rights and responsibilities, be declared to him without reservation.
4th. That the attorney inform himself of all such facts and circumstances which would reasonably come within the knowledge, and which would likely prevent the execution of the contract by the client.
5th. That he does not contract for a greater benefit than his services are reasonably worth, with reference to the trouble and difficulties of the particular case, amount involved, either of pecuniary character, or reputation personally, etc.
6th. That the onus shall devolve upon the attorney, to show that the contract was free from all fraud, undue influence, and exorbitancy of demand.
7th. That the attorney, having performed his part of the contract, reasonably, and with due skill and diligence, without regard to the result of the litigation, shall be entitled to recover the amount specified, pro- *579 yided Re brings tbe contract within the foregoing principles.
8th. In the absence of a contract, the attorney is entitled to recover upon a quantum meruit for such labor as he shall have performed.
We reverse the decree of the Chancellor, and remand the cause, and decree that an account be taken of the services of the defendant, and he be allowed what the same are reasonably worth; and that he have his lien for the sum so found; and that complainant execute to him bonds of indemnity, with good and sufficient securities, in an amount to save him harmless upon all bonds which he has executed as the surety of complainant upon such bond or bonds, being executed and delivered according to law. He shall pass to complainant all bills, notes, or other evidences of indebtedness belonging to it, and in his hands as such attorney; as well as all moneys, except the sum of $-, which shall be paid into Court, and held under its orders, subject to be appropriated by decree to the amount of the final recovery, after allowing a credit for all sums heretofore paid.